T.C. Memo. 2005-180


UNITED STATES TAX COURT


AMC TRUST, J.O. HANEY, JR., J.O. HANEY, III AND PATRICIA A. HANEY
TRUSTEES, ET AL.,[1] Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket Nos. 22243-03, 22244-03,    Filed July 25, 2005.
            22245-03, 22246-03,
            22294-03.


Curtis W. Cannon and Paul Russo Stone, for petitioners.

Catherine S. Tyson and Sheila R. Pattison, for respondent.

_____

[1]Cases of the following petitioners are consolidated
herewith:  Jopah Trust, J.O. Haney, Jr., J.O. Haney, III,
Cynthia L. Haney and Patricia A. Haney, Trustees, docket No.
22244-03; Oliver and Company, John Oliver Haney, Jr. and Patricia
Ann Haney, Trustees, docket No. 22245-03; J.O. Haney, Jr. and
Patricia A. Haney, docket No. 22246-03; and Blanco Springs Trust,
Patricia A. Haney and Patricia J. Haney, Trustees, docket No.
22294-03.

MEMORANDUM FINDINGS OF FACT AND OPINION

COHEN, Judge:  Respondent determined deficiencies and additions to tax as follows:

AMC Trust, J.O. Haney, Jr., J.O. Haney, III and Patricia A. Haney Trustees (docket No. 22243-03):

|  |  | Additions to Tax/Penalties, I.R.C. | |
| Year | Deficiency | Sec. 6651(a)(1) | Sec. 6662(a) |
| 1999 | $419,808 | $20,990.40 | $83,962.00 |
| 2000 | 390,477 | 97,619.00 | 78,095.00 |
| 2001 | 455,935 | 113,984.00 | 91,187.00 |

Jopah Trust, J.O. Haney, Jr., J.O. Haney, III, Cynthia L. Haney and Patricia A. Haney, Trustees (docket No. 22244-03):

|  |  | Additions to Tax/Penalties, I.R.C. | |
| Year | Deficiency | Sec. 6651(a)(1) | Sec. 6662(a) |
| 1997 | $10,917 | -- | $2,183.00 |
| 1998 | 21,920 | -- | 4,384.00 |
| 1999 | 21,899 | -- | 4,380.00 |
| 2000 | 8,608 | -- | 1,722.00 |
| 2001 | 8,386 | $2,096.50 | 1,677.00 |

Oliver and Company, John Oliver Haney, Jr. and Patricia Ann Haney, Trustees (docket No. 22245-03):

|  |  | Additions to Tax/Penalties, I.R.C. | |
| Year | Deficiency | Sec. 6651(a)(1) | Sec. 6662(a) |
| 1996 | $266,090 | -- | $53,218.00 |
| 1997 | 220,430 | -- | 44,086.00 |
| 1998 | 287,916 | -- | 57,583.00 |
| 1999 | 419,728 | -- | 83,946.00 |
| 2000 | 390,455 | $97,614.00 | -- |
| 2001 | 461,616 | 115,404.00 | -- |

J.O. Haney, Jr. and Patricia A. Haney (docket No. 22246-03):

| Year | Deficiency | Additions to Tax/Penalties, I.R.C. Sec. 6651(a)(1) | Sec. 6662(a) |
|------|-----------|---------------------------|--------------|
| 1996 | $32,957 | -- | $6,591.40 |
| 1997 | 31,879 | -- | 6,375.80 |
| 1998 | 8,935 | -- | 1,787.00 |
| 1999 | 155,121 | -- | 31,024.20 |
| 2000 | 44,365 | $11,048.85 | 8,873.00 |
| 2001 | 41,115 | 10,278.75 | 8,223.00 |

Blanco Springs Trust, Patricia A. Haney and Patricia J. Haney, Trustees (docket No. 22294-03):

| Year | Deficiency | Additions to Tax/Penalties, I.R.C. Sec. 6651(a)(1) | Sec. 6662(a) |
|------|-----------|---------------------------|--------------|
| 1997 | $10,722 | -- | $2,144.00 |
| 1998 | 5,429 | -- | 1,086.00 |
| 1999 | 10,917 | -- | 2,183.00 |
| 2000 | 2,823 | -- | 565.00 |
| 2001 | 9,559 | $2,389.75 | 1,912.00 |

The issue for decision is whether certain trust arrangements will be respected for tax purposes. Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

FINDINGS OF FACT

Petitioners resided in or had their principal place of business in Texas at the time that their respective petitions were filed. Petitioners J.O. Haney, Jr. (J.O.), and Patricia A. Haney (Patricia), collectively referred to as the Haneys, were the parents of J.O. Haney, III (Joey), Patricia J. Haney, and

Jenna L. Burns.  Don Hal Haney is J.O.'s brother.  Cynthia L. Haney (Cynthia) is the Haneys' daughter-in-law.

Before 1980, the Haneys operated an asphalt repair and maintenance company (the asphalt business) as a sole proprietorship under the name Asphalt Maintenance Co. of Texas (AMC).  In February 1980, the Haneys incorporated their asphalt business under the name J&J Commercial Services, Inc. (J&J).  The business was incorporated on the advice of Earl Post, an attorney, for the purpose of limiting liability.  Neither Post nor any other attorney or competent professional participated in the formation of the trusts involved in these cases.

In corporate form, J&J continued to do business as Asphalt Maintenance Co. of Texas.  J&J was owned by the Haneys, with J.O. holding a 49-percent interest and Patricia owning a 51-percent interest.  Patricia served as the president of J&J, and J.O. served as the vice president.

The Trusts

In 1993, the Haneys paid Royce McCarley (McCarley) the sum of $11,000 to prepare a trust instrument for AMC Trust.  The Haneys, however, became disenchanted with McCarley and did not implement the trust document.  The trust document prepared by McCarley was destroyed.

In 1996, the Haneys met with Karl Dahlstrom (Dahlstrom).  Dahlstrom prepared for the Haneys a "Contract and Declaration of

Trust for AMC, A Common Law Pure Trust Organization" (AMC Trust), dated October 16, 1996. At all material times, the Haneys and Joey acted as trustees of the AMC Trust. As of January 1, 1998, Cynthia acted as a fourth trustee.

Relevant provisions of the AMC Trust instrument conveyed the accounts receivable of J&J to the AMC Trust in exchange for $10 and trust certificates. The trustees were said to "act as absolute owners and hold title [to the trust property] in fee simple and control as joint tenants". The declaration provided:

> 6. The named Trustees, for themselves and their successors in trust irrevocable do hereby accept the conveyance and acknowledge delivery of all the property specified, together with all the terms of the Trust Organization herein set forth, agreeing to conserve and improve the Trust Organization, to invest and reinvest the funds of said Trust Organization, in such manner as will increase the financial rating of the Trust Organization exercising their best judgment and discretion, in accordance with the Trust organization minutes, making distribution of portions of the proceeds and income as in their discretion, and according to the minutes, and upon final liquidation distributing the assets to the existing certificate holders as their contingent right may appear; and in all other respects administering said Trust Organization in good faith strictly in conformity hereto.
>
>    *    *    *    *    *    *    *
>
> 16. The Trustees shall regard this instrument as their sufficient guide, supplemented from time to time by resolutions of their board covering contingencies as they arise and recorded in the minutes of their meetings, or by rules or regulation, as deemed expedient and consistent with the orderly conduct of business.

17.  The Trustee(s) shall have the exclusive power to construe the meaning and intent of this Trust Organization indenture or instrument and the Trustee's(s') construction shall be conclusive, legally binding and will govern.  The Trustee's(s') construction will be the same as the intention of all parties as expressed throughout the entire indenture or instrument.

         *      *      *      *      *      *      *

26.  This Trust Organization shall continue for a period of seventy-five years from date, unless the Trustees shall unanimously determine an earlier date. The Trustees may at their discretion, because of threatened depreciation in values, or other good and sufficient reason, liquidate the assets, distribute and close the Trust Organization at an earlier date determined by them.  * * *

         *      *      *      *      *      *      *

34.  Trustees may from time to time declare and pay out of net income received by them such distributions as they in their sole discretion deem proper and advisable.  Said distributions may be by actual payment or by credit.  Distribution by credit means a declaration of income will be transferred to the certificate holders via appropriate forms pursuant to the Internal Revenue Code while the actual income will be retained by the trust for reserves or reinvestment.  The trustees shall have the right, at their discretion, to revoke the certificates of any holder thereof who refuses to accept distribution by credit and pay any tax due thereon.

The Haneys and Dahlstrom also formed a trust to be known as Oliver & Co.  The "Declaration of Charitable Remainder Trust of Oliver & Co." designated J&J as the grantor, the Haneys as the trustees, and Praisesong, Inc., as the beneficiary.  The grantors purported to transfer to the trust property "described in

Schedule A", Itemized Deductions, but no Schedule A was attached. The trust provided:

> In each taxable year of the trust, the Trustee(s) shall pay to <u>J.O. Haney Jr. & Patricia A. Haney</u>, (hereinafter referred to as "the Recipient(s)"), an amount equal to five percent (5%) per annum of the net fair market value of the assets of the trust valued as of the day of the initial transfer. The annuity trust amount will be paid on an annual basis. To the extent income is not sufficient, payments may be made from principal. Any income of the trust for a taxable year in excess of the annuity trust amount shall be added to principal.

> \* \* \* \* \* \* \*

> Upon the death of the Recipient(s), the Trustee(s) shall distribute any amount due either of the Recipient(s) or the Recipient(s)' estate, under the provisions above, to the estate of the Recipient(s). The balance of the assets of this annuity trust shall be liquidated and after all termination fees, taxes, and expenses are paid, the remaining assets shall be distributed free and clear of all trusts to the Beneficiary, "Praisesong Inc.", 3013 Green Hill Dr., Plano, Texas 75093, TID #75-1621089 (hereinafter referred to as "the Charitable organization"). If the Charitable Organization is not an organization described in sections 170(c), 2055(a), and 2522(a) of the Code at the time when any principal or income of the trust is to be distributed to it, then the Trustee(s) shall distribute such principal or income to such one or more organizations described in section 170(c), 2055(a), and 2522(a) as the Trustee(s) shall select in their sole discretion.

No minutes were maintained for Oliver & Co.

After formation of the AMC Trust, the Haneys continued to operate their asphalt business in the same manner as they did when it was reported by J&J. The Haneys retained substantial control of all business activity, the business bank accounts, and

the business assets. The equipment used in the asphalt business was listed as an asset on the books of AMC Trust.

Joey worked in the asphalt business prior to and during the years in issue. Commencing in about October 1996, Joey operated the asphalt business. Joey continued to consult his parents about various business decisions and operations, and Patricia continued to perform services in the office. J.O. retained custody and control of the business records.

Oliver & Co. never made a distribution to any charitable beneficiary. After Oliver & Co. was formed, the Haneys each received annual distributions of $3,000 from Oliver & Co. In this connection, each year $6,000 was transferred from AMC Trust's bank account to Oliver & Co.'s bank account, and the Haneys, as trustees of Oliver & Co., issued checks to themselves. Otherwise, Oliver & Co. has never been funded with cash or other assets.

In addition to AMC and Oliver & Co., the Haneys also formed Jopah Trust (Jopah), TuSwanz Trust (TuSwanz), Blanco Springs Trust (Blanco Springs), Adobe Springs Trust (Adobe), JoDon II Trust, and H-Five Productions Trust (H-Five). Jopah leased equipment and real property to AMC; however, rental proceeds from AMC were reported on a Schedule C, Profit or Loss From Business, attached to the Haneys' returns for 1997 through 1999. For 2000 and 2001, payments by AMC to Jopah were reported on Jopah's

Forms 1041, U.S. Income Tax Return for Estates and Trusts, and deductions were claimed in the same amount, resulting in no taxable income.

Blanco Springs allegedly owned rental property, although the income and expenses of the real property rentals were reported on Schedules E, Supplemental Income and Loss, attached to the Haneys' returns for 1997 through 1999. TuSwanz held the real property that was occupied by the Haneys as a residence. There was no rental agreement, and the Haneys did not pay TuSwanz rent for the residence. The Haneys, and not TuSwanz, were compensated by insurance for damage to real and personal property resulting from a flood in October 1998. The Haneys claimed a casualty loss on their 1998 Federal income tax return for damage from the flood. As of 1999, TuSwanz and J.O.'s brother, Don Hal Haney, each held a 50-percent beneficial interest in Adobe.

H-Five maintained bank accounts that were used to pay the Haneys' personal living expenses. Checks written on Adobe and payable to Patricia were deposited into the H-Five bank account. TuSwanz and Adobe received royalty payments from various entities and received payments from the U.S. Department of Agriculture.

Tax Reporting and Examination

After an election of S corporation status for J&J was made in 1987, the income of the asphalt business was reported on Forms 1120S, U.S. Income Tax Return for an S Corporation. After

the formation of AMC Trust, the income of the asphalt business was reported on AMC Trust's Form 1041. AMC Trust claimed income distribution deductions, flowing the profits of the asphalt business to Oliver & Co. Neither AMC Trust nor Oliver & Co. reported any taxable income or any tax liability for the years in issue.

On its Forms 1120S, J&J reported total income of $47,968.13 for 1993; $69,971 for 1994; $1,160 for 1995; a loss of $11,983 for 1996; and zero income for 1997 through 2001. On Schedules K-1, Shareholder's Share of Income, Credits, Deductions, etc., attached to the returns for 1993 through 1996, J&J's income was shown as distributed 49 percent to J.O. and 51 percent to Patricia.

On Schedules C to its Forms 1041, AMC Trust reported profit or loss from the asphalt business as follows:

| Year | Profit or loss |
|------|----------------|
| 1996 | $111,712 |
| 1997 | 42,552 |
| 1998 | 75,051 |
| 1999 | 288,096 |
| 2000 | 79,567 |
| 2001 | 66,363 |

On each of its Forms 1041, AMC Trust reported taxable income of minus $100, after deducting the total reported profit as an "income distribution deduction". The profits from the asphalt business in fact exceeded the amounts set forth above because of

deductions disallowed by respondent and not contested by petitioners.

On their Form 1040, U.S. Individual Income Tax Return, for 1994, filed on or about October 16, 1995, the Haneys reported total tax of $50,463. On their Form 1040 for 1995, filed on or about October 15, 1996, the Haneys reported total tax of $183.

On their Form 1040 for 1996, the Haneys reported total tax of $2,951. On the signature page of the 1996 Form 1040, Patricia twice wrote the words "*See attached disclaimer statement". Attached to the Form 1040 was a "Disclaimer Statement" and various tax protest materials claiming that the assessment and payment of income tax is voluntary and other legalistic arguments taken out of their original context.

On their Form 1040 for 1997, the Haneys reported total tax due of $3,956. The return was signed by each of the Haneys, with the word "Trustee" following his or her signature. On Schedule C, a loss of $13,524 was claimed from "Equipment leasing". The return reported wages from AMC Trust in the amount of $2,000 for J.O. and $7,000 for Patricia.

On their Forms 1040 for 1998 and 1999, the Haneys reported zero tax liability. On their Form 1040 for 2000, filed in September 2002, the Haneys reported zero income tax and self-employment tax of $230. On their Form 1040 for 2001, filed in October 2002, the Haneys reported total tax of $9,967.

Oliver & Co. did not report the asphalt business net income on any return for 1996 through 1999. On its Form 1041-A, U.S. Information Return Trust Accumulation of Charitable Amounts, for 2000, dated September 25, 2002, Oliver & Co. reported income from AMC Trust in the amount of $79,567, charitable deductions of $73,567, and fiduciary fees of $6,000, leaving zero net income. Oliver & Co. made no distribution to any charitable beneficiary during the years in issue.

The Oliver & Co. Form 1041-A was filed after examination of petitioners' returns commenced. When Joey was contacted about the examination of AMC Trust, he referred the revenue agent conducting the examination to J.O. The Haneys sent to the revenue agent a document entitled "Notice of Expatriation and Repatriation" dated March 11, 2002, in which they purported to disavow their citizenship in the United States and "repatriate back into the Texas Republic".

The Internal Revenue Service commenced a proceeding to enforce a summons, and by order filed June 12, 2002, J.O. and Joey were ordered to produce the records and materials requested in the summons. On July 1, 2002, the U.S. District Court for the Western District of Texas, San Antonio Division, filed an order finding, among other things, that J.O. and Joey "had submitted a series of 'tax protestor' type responses to the summons and had not complied with the May 9, 2002 Order." The Court order

further recited that it had admonished J.O. and Joey to comply with the applicable law and court orders and recommended that they consult with qualified legal counsel; that J.O. and Joey requested additional time to assemble records and have the opportunity to consult with legal counsel; that, instead, J.O. and Joey had filed documents that:

> are the type that have been previously rejected by the Courts as groundless, not requiring response and sanctionable. See Lonsdale v. United States, 919 F.2d 1440, 1447-48 (10th Cir. 1990); United States v. Montgomery, 778 F.2d 22, 225 (5th Cir. 1985); Crain v. C.I.R., 737 F.2d 1417 (5th Cir. 1984). * * * [J.O. and Joey] are again admonished that they will be held to comply with applicable laws and questions concerning their rights and obligations should be directed to qualified legal counsel. The Court will not permit valuable judicial resources to be wasted and government process delayed dealing with frivolous filings.

On July 12, 2002, J.O. and Joey appeared before the revenue agent. They made frivolous arguments and asserted that they would not answer questions because of their Fifth Amendment privilege. At a hearing on July 19, 2002, J.O. testified:

> the activity of the trust, the documents that the Internal Revenue Service--various things of that sort have been my creations, my son has followed his father's advice apparently to his great sorrow. I take full responsibility for any of the documents, the trusts. He has a limited knowledge of--he's read it all, but he's a very good worker. He manages and runs the business. * * *

On July 26, 2002, the District Court held J.O. and Joey in contempt of court. The District Court ordered that Joey be taken into custody and held pending compliance with the District

Court's order, but the District Court stayed incarceration pending compliance with its orders.  Thereafter, records were finally produced, and the revenue agent's questions were answered by then recently retained counsel.

## OPINION

The issue in these cases is whether certain trusts established by the Haneys will be respected for tax purposes. All other issues have been abandoned by petitioners' failure to address them in their briefs.  Rule 151(e)(2), (4); Cluck v. Commissioner, 105 T.C. 324, 325 n.1 (1995); Petzoldt v. Commissioner, 92 T.C. 661, 683 (1989); Money v. Commissioner, 89 T.C. 46, 48 (1987); see Vetrano v. Commissioner, T.C. Memo. 2000-128; Levert v. Commissioner, T.C. Memo. 1989-333, affd. without published opinion 956 F.2d 264 (5th Cir. 1992).  Questions concerning the viability of the various trusts for tax purposes are substantially resolved based on concessions expressly made in petitioners' filings, as quoted below.  Petitioners' concessions have simplified this opinion, because making sense of the extensive and internally contradictory record without the assistance of well-organized proposed findings of fact from either party would be an undue burden on the Court.  See Stringer v. Commissioner, 84 T.C. 693, 705 (1985), affd. without published opinion 789 F.2d 917 (4th Cir. 1986).

Petitioners bear the burden of proof in these cases, and it has not shifted under section 7491(a). Petitioners did not present credible evidence that the trusts had economic substance, and the credibility of the evidence that they did produce was undermined by their implausible claims. Petitioners did not cooperate with respondent's examination; in fact, they obstructed the examination by refusing to produce documents or answer questions until J.O. and Joey were found in contempt by the District Court. Sec. 7491(a)(2)(B).

The most implausible of petitioners' claims is the Haneys' assertion that the multiple trusts that they established, with the effect of their reporting minimal tax liability on substantial profits of the asphalt business, were not tax-motivated. Petitioners contend that the trusts were established for "asset protection" purposes. They have never explained, however, how the multiple trusts gave them more protection against potential but unnamed creditors than that provided by the corporate form in which the asphalt business was operating from 1980 through 1996. We are not persuaded that the vague term "asset protection" contemplates any creditors other than the U.S. Treasury.

The Haneys reported significant income tax liability on their 1994 return, filed in October 1995. The next year they met with Dahlstrom. Attached to their 1996 return was a frivolous

"disclaimer", as to which J.O. testified: "I would assume it came from Karl Dahlstrom". The Haneys denied that they discussed tax avoidance with Dahlstrom. Dahlstrom, however, had been in the abusive trust business for many years. See, e.g., Akland v. Commissioner, 767 F.2d 618 (9th Cir. 1985), affg. T.C. Memo. 1983-249; United States v. Dahlstrom, 713 F.2d 1423 (9th Cir. 1983); Dahlstrom v. Commissioner, T.C. Memo. 1991-264 and 1991-265, affd. without published opinion 999 F.2d 1579 (5th Cir. 1993). The Haneys claim that they did not know of Dahlstrom's history. Whether they did or did not know of the reported cases, we do not believe that Dahlstrom did not use tax avoidance as an objective in promoting his trust schemes. In addition, the lack of credibility in J.O.'s testimony is demonstrated by the following colloquy:

> Q [respondent's counsel] Mr. Haney, so Mr. Dahlstrom did not mention anything about using the trusts would--about the trusts providing tax savings?
>
> A [J.O.] Not to my knowledge. Define tax savings.
>
> Q Sir, are you saying that he did not say it or do you not remember him saying it?
>
> A I don't remember him saying it, but what--what do you mean, talk about? What--
>
> Q Did he mention taxes, federal income taxes, at all in his presentations?
>
> A He mentioned that each trust should have an EIN number so they could do their tax returns.

    Q   Anything else?

    A   Not to my recollection.

Patricia claimed that she did not recall the disclaimer attached to the 1996 return.  Patricia also denied any recollection of the documents that the Haneys signed in 2002.

    J.O. attributed to other sources, including the Internet, the frivolous documents they submitted in 2002 and their frivolous responses in the summons enforcement proceedings.

    We do not accept petitioners' claims that the trusts were not tax-motivated.  Tax motivation alone, however, is not a ground for disregarding the trusts.  The parties have addressed in their briefs the relevant factors, based on Markosian v. Commissioner, 73 T.C. 1235, 1243-1244 (1980), which are: (1) Whether the Haneys' relationship to the asphalt business and other assets changed when the trusts were created; (2) whether the trusts had an independent trustee; (3) whether an economic interest passed to other trust beneficiaries; and (4) whether the Haneys were bound by any meaningful restrictions on the trusts' operation.  See, e.g., Sparkman v. Commissioner, T.C. Memo. 2005-136; Edwards v. Commissioner, T.C. Memo. 2005-52; Gouveia v. Commissioner, T.C. Memo. 2004-256.  Petitioners have conceded that none of the trusts had an independent trustee.

The Haneys' Relationship to the Property of the Trust

Petitioners argue in their opening brief:

It is only the economic substance of AMC Trust, and Oliver & Company Charitable Remainder Trust, that need be evaluated.

\*       \*       \*       \*       \*       \*       \*

Prior to the creation of AMC Trust, Mr. and Mrs. Haney, as shareholders of the Subchapter S corporation, J&J Commercial Services, Inc., enjoyed full and unrestricted use of all the business assets and income produced by the operation of Asphalt Maintenance Company.

After the creation of AMC Trust, Mr. and Mrs. Haney continued to have full and unrestricted use only of the assets simultaneously placed in the grantor trusts. Their personal residence was placed in one grantor trust, and its upkeep was paid for by Mr. and Mrs. Haney's personal assets and income, not by property of AMC Trust. Their personal vehicles were placed in another grantor trust, and again, upkeep was paid for from personal sources, not AMC Trust.

Business machinery and equipment was placed in a grantor trust and was leased to AMC Trust for payment. Maintenance of the equipment was, per the terms of the lease, the responsibility of the lessee. Land acquired by Mrs. Haney was placed in Jopah Trust and leased to AMC Trust for payment. In both cases, these leases were reasonable and rational uses for property controlled by Mr. and Mrs. Haney, but beyond the right to receive rent, their ownership interest in the subject property through the grantor trusts does not imply or convey any greater control over other revenues of Asphalt Maintenance Company or AMC Trust. [Exhibit refs. omitted.]

On the other hand, respondent argues:

The Haneys simply operated AMC in the exact same manner as they conducted operations as J&J. They retained substantial control of the business activity and the bank accounts.

Prior to the creation of the trust arrangements, the Haneys were grooming their son, Joey Haney, to assume control of the family-run asphalt business. After the creation of AMC, the Haneys were still active in the asphalt business. Eventually, Petitioner-husband [J.O.] retired but Petitioner-wife [Patricia] remained active. The asphalt business retained the same employees and operated in the same manner as prior to the creation of the trusts.

AMC used trust units instead of J&J corporate shares. They continued to use the same name, Asphalt Maintenance Company of Texas, to do business using the same assets. They reported the equipment and business real property assets supposedly transferred to the trusts on AMC's financial statements. J&J and AMC used the same equipment and real property in the asphalt business.

We agree with respondent. The only instances cited by petitioners of "differences" with respect to the asphalt business are differences of form created by the trusts. Thus their reasoning is circular. They have shown no material difference in the manner in which the business was operated or the assets were used before and after creation of the trusts. See Sparkman v. Commissioner, supra; Edwards v. Commissioner, supra; Gouveia v. Commissioner, supra; Castro v. Commissioner, T.C. Memo. 2001-115.

Transfer of Economic Interest

Petitioners' position is that the earnings of the asphalt business operated by AMC Trust are not taxable because they were transferred to Oliver & Co., allegedly a "charitable remainder trust". This rationale is used by petitioners to explain why neither AMC Trust nor Oliver & Co., nor any of the other trusts, ever reported any taxable income or paid any Federal income

taxes. In fact, however, the only funds ever transferred to Oliver & Co. were the amounts necessary to pay back to the Haneys "trustee fees". In their posttrial opening brief, petitioners:

> recognize that there is some doubt as to the correctness of taking those deductions [for income of the asphalt business not taxed because it was shown as distributed to Oliver & Co.], since the funds they represent remained available to AMC Trust for its operations of Asphalt Maintenance Company, and were not actually transferred beyond AMC's reach. * * *

The facts found concerning Oliver & Co. establish that it was not a bona fide charitable remainder trust. See secs. 642(c), 664(d); sec. 1.664-1(a)(4), Income Tax Regs. It was simply one of a series of trust entities established to make taxable profits of the asphalt business disappear. Petitioners have failed to prove that any economic interest passed to anyone other than the Haneys. See Markosian v. Commissioner, supra at 1244; Sparkman v. Commissioner, supra; Edwards v. Commissioner, supra; Gouveia v. Commissioner, supra; Castro v. Commissioner, supra.

Trust Restrictions

Our findings of fact are notably devoid of any meaningful restrictions contained in the trust documents, because there were no meaningful restrictions. Petitioners concede in their pretrial memorandum: "The only affirmative restriction placed on Petitioners' actions by the AMC trust document is that they are required to exercise their best judgment and discretion for the conservation and improvement of the trust organization." At

trial, the Haneys agreed that they could not take the funds of AMC Trust to Las Vegas, Nevada, and gamble them away and asserted that they could not liquidate the assets of AMC Trust and distribute the money to the trustees.  In their posttrial opening brief, petitioners argue:  "The trustees, in essence, are required to exercise prudent business judgment, to the benefit of the trust organization."  Petitioners again proceed to a circular argument that "these limitations, despite not being excessive or burdensome, are substantial.  They do constrain the discretion of the trustees, and that fact is reflected in the behavior of the trustees in this case".  The Haneys' subjective beliefs as to any prudent limitations and their behavior do not establish any restrictions.  The objective fact is that none of the Haney family members were restricted by any provision in the trust agreements, and they controlled all decisions concerning the trust property.  Neither in the documents nor in their conduct is there any evidence that they were bound by any meaningful restrictions imposed by the trusts or by the law of trusts.  See Markosian v. Commissioner, 73 T.C. at 1244; Sparkman v. Commissioner, T.C. Memo. 2005-136; Edwards v. Commissioner, T.C. Memo. 2005-52; Gouveia v. Commissioner, T.C. Memo. 2004-256; Castro v. Commissioner, supra.

Conclusion

After considering the factors set forth in our prior cases and discussed in the briefs of the parties, we conclude that AMC Trust, Oliver & Co., Blanco Springs, and Jopah were shams, lacking economic substance, and are to be disregarded for Federal income tax purposes.  The net income of the asphalt business is properly taxable to the Haneys.  We need not consider respondent's alternative arguments that would lead to the same result.

To reflect the foregoing and to eliminate "whipsaw" determinations made against the trusts,

Decisions will be entered under Rule 155.